# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **HEATH EVANS,** | ] |
| | ] |
| **Plaintiff,** | ] |
| | ] |
| **v.** | ]   **Case No.: 2:22-cv-00075-ACA** |
| | ] |
| **LIFE INSURANCE COMPANY** | ] |
| **OF NORTH AMERICA,** | ] |
| | ] |
| **Defendant.** | ] |

## MEMORANDUM OPINION

Plaintiff Heath Evans was injured while working as a wireline operator for Schlumberger Technology Corporation and received long-term disability benefits from Schlumberger's ERISA benefits plan (the "Plan") for years. Defendant Life Insurance Company of North America ("LINA") is the Plan administrator. In 2020, after a review of Mr. Evans's entitlement to disability benefits, LINA determined that Mr. Evans was no longer disabled within the meaning of the Plan. Mr. Evans appealed the determination through LINA's administrative processes before filing this lawsuit, alleging that LINA wrongfully terminated his benefits.

Mr. Evans and LINA have filed cross-motions for judgment on the administrative record. (Docs. 26, 27). Because the evidence in the administrative record fails to show that Mr. Evans continues to be disabled as defined by the Plan, LINA's decision to discontinue Mr. Evans's benefits is not wrong. Therefore, the

court **WILL GRANT** LINA's motion for judgment on the administrative record and **WILL DENY** Mr. Evans's motion for judgment on the administrative record.

## I.    BACKGROUND

Mr. Evans worked as a wireline operator for Schlumberger Technology Corporation. (Doc. 23-2 at 173). As classified by the Department of Labor, wireline operators "must be able to perform very heavy physical labor." (Doc. 23-8 at 73). Schlumberger provided employees with group welfare benefits that included a disability benefits plan. (Doc. 23-13 at 275, 306). MetLife was originally the claims administrator for the Plan. (*See* doc. 23-12 at 8). LINA now administers the Plan and "has full discretion and authority to make final determinations of all questions relating to payment of Plan benefits and to interpret the Plan for that purpose." (Doc. 23-14 at 19).[1]

Under the Plan, an employee can qualify to receive short-term disability benefits for up to fifty-two weeks. (Doc. 23-13 at 306). After exhausting short-term disability, the employee can apply to receive long-term disability. (*Id.*; doc. 23-14 at 6). Once the employee has qualified as disabled for a two-year period, the employee may continue to receive long-term disability benefits if he is "unable to perform the

---

[1] Mr. Evans refers to Defendant LINA as Cigna in his briefing and some correspondence that he received contains the name Cigna. (*See* doc. 28; *see, e.g.*, doc. 23-9 at 63). LINA is referred to as Cigna in Plan's summary description. (Doc. 23-13 at 306). LINA was previously an indirect subsidiary of Cigna before it was acquired by New York Life. (*See* doc. 26 at 7 n.2). No party disputes LINA is the proper party, so to avoid confusion the court will use term LINA.

duties of any occupation (not just [his] job at Schlumberger) for which [he is] reasonably suited due to [his] education, training, or experience." (Doc. 23-14 at 13).

If a claim for disability benefits is denied, the employee may appeal the determination. (*Id.* at 21). First, as part of the claimant's mandatory administrative remedies, the determination must be appealed in writing within 180 days. (*Id.*). The employee may include additional "written comments, documents, records and other information relating to [the employee's] claim for benefits." (*Id.*). If the claim is denied on appeal, the employee may submit a voluntary second appeal. (Doc. 23-14 at 22). An employee is not required to file a voluntary second appeal before filing a lawsuit for benefits based on a denial of a first appeal, and the filing of a second appeal does not extend the deadline for filing suit which is based on the date a first appeal is denied. (*Id.*).

In November 2013, Mr. Evans suffered a workplace injury to his back. (Doc. 23-2 at 3, 22; doc. 23-8 at 43, 239; doc. 23-13 at 2). After receiving short-term disability for a year, Mr. Evans applied for and was granted long-term disability benefits. (Doc. 23-9 at 201). A year later, MetLife reviewed Mr. Evans's eligibility for benefits and determined he still qualified under the "any occupation" standard of disability. (Doc. 23-12 at 8). MetLife also informed Mr. Evans that it would "periodically require that [he] provide updated information concerning [his]

disability" and that "improvement in [his] medical condition[]" could affect his benefits. (*Id.*).

Mr. Evans underwent two surgeries in connection with his back injury, one in 2014 and one in 2015. (Doc. 23-4 at 68–70, 75–78; doc. 23-9 at 227). After the second surgery, Mr. Evans's reached maximum medical improvement "with permanent restrictions of no lifting or carrying greater than 50 pounds." (Doc. 23-9 at 227). After both surgeries, Mr. Evans still complained of intense back pain that was "exacerbated with physical activity involving lifting, bending, twisting, and sitting or standing in a static position for prolonged periods." (*Id.* at 228).

Mr. Evans filed for disability and disability insurance benefits with the Social Security Administration in July 2015. (Doc. 23-5 at 86; doc. 23-9 at 243). In May 2018, the administrative law judge presiding over Mr. Evans's claim issued a fully favorable decision for Mr. Evans. (Doc. 23-12 at 34, 39–41; doc. 23-13 at 1–7). The Social Security Administration defines disability as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments . . . that has lasted or can be expected to last for a continuous period of not less than 12 months." (Doc. 23-12 at 39–40). The administrative law judge found that Mr. Evans had the residual functional capacity to perform light work with a number of postural and exertional limitations. (Doc. 23-13 at 1). The administrative law judge also found that

4

Mr. Evans would be off task fifteen percent of the day and would be absent three times a month. (*Id.*). The vocational expert testified that there were no jobs in the economy where Mr. Evans's acquired job skills would transfer that also accommodated his residual functional capacity. (*Id.* at 6). But the judge stated that "continued treatment and medication compliance" could cause Mr. Evans's "conditions [to] improve or stabilize sufficiently to allow" him to work and thus recommended a "continuing disability review" in eighteen months. (*Id.*).

In February 2018, after LINA took over as claims administrator, it informed Mr. Evans it was reviewing his entitlement to disability benefits. (Doc. 23-8 at 76–77; *see* doc. 23-13 at 241). With this review, LINA requested updated medical records from Mr. Evans and his doctors. (Doc. 23-8 at 76–77, 80, 88, 106, 112, 118, 134). This included medical records from Mr. Evans's family doctor, Dr. Mensah. (*Id.* at 88; *see* doc. 23-2 at 171). Dr. Mensah's records indicate that Mr. Evans reported he was suffering from severe pain, that he was unable to lift or carry any weight, and was limited from sitting and desk level reaching, but those findings were only based on Mr. Evans's own report of his abilities. (Doc. 23-2 at 120–121, 135; *see* doc. 23-8 at 88). LINA requested additional information from Dr. Mensah regarding "what [he was] seeing on exam that would prevent [Mr. Evans] from doing these activities more often." (Doc. 23-8 at 88, 90). It is unclear from the administrative record whether Dr. Mensah provided this information, but in a

5

November 2019 examination note, Dr. Mensah indicated that Mr. Evans had "normal muscle strength and tone, normal gait and [was] oriented." (*Id.* at 219; *see id.* at 52).

LINA also received records from Mr. Evans's physical therapist, Heather Bowman, PT, MPT. (Doc. 30-1 at 12–14). Ms. Bowman evaluated Mr. Evans in March 2019 and assessed that Mr. Evans was capable of sitting for approximately five minutes, standing for three minutes, and was completely unable to reach, lift or carry over three pounds, push, pull, climb stairs or ladders, balance, stoop, crouch, crawl, kneel, or use the lower extremities for foot controls. (*Id.* at 13–14). Ms. Bowman attested that "[i]t [was her] professional opinion after performing the physical ability assessment as well as treating [Mr. Evans] for three sessions that [Mr.] Evans [was] unable to perform an 8 hour workday even with positional changes, rest breaks, and meal breaks at appropriate intervals and that attempting to do so would place him at risk of personal injury." (*Id.* at 12).

LINA also requested that Mr. Evans undergo an independent medical evaluation conducted by Dr. Estwanik, a licensed physician board certified in orthopedic surgery. (Doc. 23-14 at 89–95). Dr. Estwanik observed that Mr. Evans exhibited "highly dramatic and over the top pain behavior" but that Mr. Evans "appeared physically and objectively to have good alignment and strength of the lower extremities." (*Id.* at 93). Dr. Estwanik then explained how Mr. Evans exhibited

six Waddell signs, which are used by physicians to signal malingering in patients. (*Id.*; *see* doc. 23-9 at 2). Dr. Estwanik found it significant that Mr. Evans had "undergone an excessive amount of doctor shopping and highly excessive amounts of physical therapy not indicated by any objective method." (Doc. 23-14 at 94). Based on his examination and review of Mr. Evans's medical records where doctors had expressed concerns about Mr. Evans's level of pain, Dr. Estwanik diagnosed Mr. Evans with "significant symptom magnification of a non-physiologic basis." (*Id.* at 94).

Dr. Estwanik found that Mr. Evans had no restrictions with reaching, manipulation, grasping items, lifting and carrying ten pounds, balancing, kneeling, or using his lower extremities for foot controls. (*Id.* at 96–97). He concluded Mr. Evans could frequently sit, stand, walk, lift and carry twenty pounds, push and pull forty pounds, climb stairs, and stoop and could occasionally lift fifty pounds, crouch, and crawl. (*Id.* at 96–97). Finally, Dr. Estwanik found Mr. Evans could rarely carry up to fifty pounds or climb ladders and he could never lift or carry over fifty pounds. (Doc. 23-14 at 97). Later, LINA requested that Dr. Estwanik supplement his opinion after reviewing more of Mr. Evans's medical records, but this review did not change Dr. Estwanik's opinion regarding Mr. Evans's abilities. (*Id.* at 99–102).

On March 5, 2020, Dr. Carabello, a licensed physician board certified in occupational medicine, reviewed all of Mr. Evans's "available medical and/or vocational evidence bearing on disability and/or functional capacity." (*Id.* at 52; doc. 30-1 at 3–6). Dr. Carabello determined that Dr. Estwanik's opinion regarding Mr. Evans's qualification for long-term disability was correct and Dr. Mensah's opinion was "not well supported by medically acceptable clinical or laboratory diagnostic techniques and [wa]s inconsistent with the other substantial evidence in the claim file." (Doc. 30-1 at 4). Dr. Carabello found there was no documentation supporting the extreme limitations Mr. Evans allegedly suffers and that Dr. Mensah's opinion was "based solely on [Mr. Evans's] report[s of pain], not on observation, examination, or functional assessment." (*Id.* at 5).

On March 12, 2020, LINA informed Mr. Evans that it had conducted a review of all Mr. Evans's medical information on file and determined that he no longer qualified for long-term disability. (Doc. 23-8 at 199–203). LINA specifically considered Dr. Mensah's notes from October 2018 to January 2020 and Dr. Estwanik's independent medical evaluation. (*Id.* at 200–201). LINA found that Dr. Mensah noted in May 2019 that Mr. Evans's gait, reflexes, and sensation were normal. (*Id.* at 200). Dr. Mensah noted similar findings in November 2019 and January 2020. (*Id.* at 201). Further, LINA relied on Dr. Estwanik's evaluation and observation of six Waddell signs during his independent medical evaluation as well

as Mr. Evans's calf measurements, which did "not support functional disuse . . . or weakening of either leg." (Doc. 23-8 at 200–201). LINA also was persuaded by Dr. Carabello's opinion "that the conclusions made and opinions provided by" Dr. Estwanik were correct. (*Id.* at 201).

LINA then transferred Mr. Evans's claim to the vocational department, which considered Mr. Evans's "work capacity, restrictions, . . . education and employment history" and found that Mr. Evans could perform work as a gate guard; assembler, small products I; or surveillance system monitor. (*Id.* at 25–26, 201). LINA informed Mr. Evans that it evaluated his social security file when making its decision and found that it had access to more recent medical records than those relied on by the Social Security Administration. (*Id.* at 202). Thus, because there were jobs in the market that Mr. Evans could perform, LINA determined that no further benefits were due under Schlumberger's long-term disability policy. (Doc. 23-8 at 201).

In September 2020, Mr. Evans appealed LINA's denial of long-term disability benefits and submitted records from a visit with a physical therapist in May 2020, and declarations from himself and several family members regarding Mr. Evans's injury. (*Id.* at 252–273). He also included an abstract from an article published in a medical journal in 2004 that indicated "that there was little evidence for the claims of an association between Waddell signs and secondary gain and malingering." (*Id.* at 252, 274–75). The declarations from Mr. Evans and his mother, brother, and

9

grandmother outline how their day-to-day lives have changed since Mr. Evans's injury and why they believe he is no longer able to work. (*Id.* at 239–250). The new physical therapy evaluation of Mr. Evans was a "[o]ne time visit" conducted by John Lawrimore, PT for an "updated [home exercise program] and continued disability evaluation." (Doc. 23-8 at 264–273). Mr. Lawrimore found that Mr. Evans had ambulation, balance, endurance, range of motion, strength, and transfer deficits, and was a fall risk. (*Id.* at 271). Mr. Lawrimore also indicated that Mr. Evans appeared to be in pain, had a reduced range of motion, and a "very antalgic gait pattern." (*Id.*).

LINA referred Mr. Evans's appeal to an independent physician consultant, Dr. Dominitz, who found that "despite the conflicting information regarding IME performed by orthopedic surgeon, Dr. Estwanik, MD, and Mr. Evans' other providers who have restricted him primarily due to his reports of pain and decreased function, [Dr. Dominitz did] believe that Mr. Evans [wa]s physically functionally limited as a result of perceived pain" but that "Mr. Evans' pain [wa]s not of the severity that his back pain would prevent him being able to sustainably perform activities that are sedentary in nature." (Doc. 23-9 at 53). Dr. Dominitz concluded that Mr. Evans was capable of sedentary work, was able to occasionally stand and walk with the assistance of a cane, and could sit for unrestricted periods of time. (*Id.* at 50–56). After receiving Dr. Dominitz's review, Mr. Evans submitted a pain diary

10

outlining his lack of mobility and sleep, inability to perform daily tasks, and medication use. (Doc. 23-11 at 196–213; *see id.* at 191).

In January 2021, LINA issued an opinion denying Mr. Evans's appeal for long term disability benefits. (Doc. 23-13 at 26–31). The opinion indicated that reviewers received but ultimately did not consider Mr. Evans's pain diary because it was not medical documentation. (*Id.* at 27). LINA reaffirmed that Dr. Mensah's examinations of Mr. Evans still showed no acute distress, normal muscle strength, ability to walk with a cane, and occasional use of a back brace. (*Id.* at 28). Further, LINA found that there was no objective medical evidence that supported Mr. Evans's reported pain levels. (*Id.*). An updated transferrable skills analysis was conducted to account for Dr. Dominitz's opinion that Mr. Evans could only engage in a sedentary occupation. (Doc. 23-13 at 29). That analysis found that Mr. Evans could work as a routing clerk or gate guard. (Doc. 23-13 at 29).

In August 2021, Mr. Evans filed a second, voluntary appeal directly to Schlumberger and included additional medical records from Dr. Mensah. (Doc. 23-14 at 105–106; doc. 23-15 at 1–6). The new records contained more assertions by Dr. Mensah that Mr. Evans was unable to work due to pain. (Doc. 23-15 at 52–54). Although this record indicates that Dr. Mensah's findings are based on his examinations of Mr. Evans, there are no accompanying treatment notes or objective medical findings. (*See id.*). In January 2022, Mr. Evans filed his complaint in this

11

action, asserting a claim for long-term disability benefits owed under the Plan. (Doc. 1; *see* doc. 28 at 15). In May 2022, Schlumberger denied Mr. Evans's second, voluntary appeal after considering the medical evidence Mr. Evans submitted and Dr. Estwanik's independent medical examination. (Doc. 23-15 at 56).

## II.   ANALYSIS

Mr. Evans asserts a claim against LINA pursuant to 29 U.S.C. § 1132(a)(1)(B) to "recover benefits due to him under the terms of his plan." (*See* doc. 1 at 2 ¶ 3). Mr. Evans "bears the burden of proving his entitlement to contractual benefits." *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998).

The Eleventh Circuit applies a six-step framework in "virtually *all* ERISA-plan benefit denials." *White v. Coca-Cola Co.*, 542 F.3d 848, 853 (11th Cir. 2008) (quotation marks omitted; emphasis in original). Under this framework, a district court evaluating a denial of benefits under ERISA should:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011).

LINA argues that its decision is not *de novo* wrong, and even if were, the decision was reasonable and should be affirmed under an arbitrary and capricious standard of review. (Doc. 26 at 17–26; doc. 31 at 3). For a variety of reasons, Mr. Evans argues that the only appropriate standard of review is *de novo* and alternatively, that LINA's denial of benefits was arbitrary and capricious. (Doc. 28 at 17–21, 27). As explained below, because under a *de novo* review, LINA's decision was not wrong, the court's inquiry ends and the court need not decide whether that is the only appropriate standard of review. *See Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1196 (11th Cir. 2010).

Although the court may consider evidence beyond the administrative record when conducting a *de novo* review, *see Harris v. Lincoln Nat'l Life Ins. Co.*, 42 F.4th 1292, 1296–97 (11th Cir. 2022), the parties move for the court to decide this case solely on the administrative record. When deciding whether a plan administrator's denial of benefits was *de novo* wrong, the question before the court is whether it

13

"would reach the same decision as the administrator." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008). Under the Plan, an individual is disabled when, after being classified as disabled for a two-year period, he cannot "perform the duties of any occupation (not just [his] job at Schlumberger) for which [he is] reasonably suited due to [his] education, training, or experience." (Doc. 23-8 at 199). Upon *de novo* review of the administrative record, the court finds that Mr. Evans is not disabled as defined under the Plan and therefore LINA was not *de novo* wrong.

The court begins its analysis with a review of the opinions of various physicians. When a treating physician's opinion conflicts with that of an independent doctor's opinion, the court can decide the appropriate weight for each opinion without regard to a doctor's status as a treating physician. *See Blankenship*, 644 F.3d at 1356. Here, non-treating physicians Dr. Estwanik, Dr. Dominitz, and Dr. Carabello found that Mr. Evans's pain levels are not as severe as described and would not keep him from sedentary work. (Doc. 23-14 at 89–95; doc. 23-9 at 50–55; doc. 30-1 at 3–6). The court finds these opinions persuasive.

Drs. Estwanik, Dominitz, and Carabello relied on objective medical evidence such as imaging studies, the success of Mr. Evans's two surgeries, physical examinations, and review of Mr. Evans's prior medical records. (Doc. 23-14 at 89–95; doc. 23-9 at 50–55; doc. 30-1 at 3–6). This contrasts with the medical opinions

14

Mr. Evans provided from treating physician Dr. Mensah, which concluded that Mr. Evans is disabled solely based of self-reports of pain. (*See* doc. 23-2 at 120–121); *see Doyle*, 542 F.3d at 1362–63 (placing "greater emphasis on . . . medical reports based on objective medical evidence" is not improper). Further, Mr. Evans's daily living activities—including the ability to drive, do light housework, and generally care for himself—are consistent with Dr. Dominitz's opinion that Mr. Evans can perform sedentary work that corresponds with his education and experience. (Doc. 23-2 at 174; doc. 23-9 at 162, 164; *see* doc. 23-9 at 53).

Mr. Evans argues that Dr. Estwanik's opinion that he was exaggerating his symptoms should be ignored because it is not supported by other medical evidence. (Doc. 28 at 24–26). But this is not a fair characterization of the administrative record. As discussed above, Dr. Dominitz and Dr. Carabello agree with Dr. Estwanik's evaluation. (*See* doc. 23-9 at 53; doc. 30-1 at 3–6). And there are notes from multiple other doctors who evaluated Mr. Evans since the onset of his injury that found that he was potentially exaggerating his symptoms. (*See* doc. 23-4 at 157; doc. 23-10 at 58). Further, there is other evidence in the administrative record that supports Dr. Estwanik's finding that Mr. Evans can work, such as Dr. Mensah's treatment notes indicating that Mr. Evans had "normal muscle strength and tone, normal gait and [was] oriented." (Doc. 23-8 at 214; *see also* doc. 23-15 at 23, 29).

15

Mr. Evans also maintains that Dr. Estwanik's reliance on Waddell signs in his evaluation was improper because recent medical literature questions the effectiveness of Waddell signs when determining if a patient is malingering. (Doc. 28 at 25–26). Mr. Evans has submitted medical literature arguing that Waddell signs are "misinterpreted and misused both clinically and medico-legally." (*Id.* at 25; doc. 23-9 at 1–2). Even if Waddell signs are questionable indicators of malingering, they were not the only indicator of malingering that Dr. Estwanik found in his evaluation of Mr. Evans. He examined Mr. Evans's MRI and medical records since 2013. (Doc. 23-14 at 90–92, 94). The MRI indicated that Mr. Evans's surgeries were successful and the medical records showed that multiple doctors had previously expressed concerns about whether Mr. Evans was malingering. (*Id.*). His own physical examination of Mr. Evans showed that his muscle strength did not support "functional disuse nor a neurological based atrophy or weakening of either leg." (*Id.* at 93). He also found it significant that Mr. Evans "had undergone an excessive amount of doctor shopping and highly excessive amounts of physical therapy not indicated by any objective method." (*Id.* at 94). Thus, Dr. Estwanik relied on more than Waddell signs to conclude that Mr. Evans was malingering.

Mr. Evans urges the court to give deference to Dr. Mensah's opinion as his treating physician. (*See* doc. 28 at 26–27). The court declines the invitation because the court is not required to give the opinions of treating physicians more weight in

16

its review. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Even if it were, Dr. Mensah's evaluations of Mr. Evans indicate that they are either (1) based solely on Mr. Evans's "customer report" (doc. 23-2 at 120–121) or (2) do not provide any reasoning to support the determination that Mr. Evans is unable to work (doc. 23-15 at 52–54). And despite Dr. Mensah's repeated assertions that Mr. Evans cannot work, there are multiple occasions where Dr. Mensah indicated that Mr. Evans had a normal gait and normal muscle strength and tone. (*Id.* at 23, 29). Thus, Dr. Mensah's opinions that Mr. Evans is almost completely functionally limited are not supported by his own examinations of Mr. Evans.

Further, the court is not persuaded by the March 2019 physical ability assessment performed by Mr. Evans's physical therapist, Heather Bowman. (*See* doc. 30-1 at 12–14). As explained by LINA (doc. 31 at 18), Ms. Bowman found that Mr. Evans was unable to reach at desk level or use his lower extremities for foot control (doc. 30-1 at 14), despite Mr. Evans's own reports of being able to drive (doc. 23-2 at 174; doc. 23-4 at 110). If Mr. Evans were as limited as Ms. Bowman suggests, he would not be able to drive a car. Because Ms. Bowman's findings contradict with Mr. Evans's own reports of activities of daily living, Ms. Bowman's findings are not persuasive.

Mr. Evans cites to several providers' opinions that he would be permanently disabled to show that LINA's denial of disability benefits was *de novo* wrong. (Doc.

28 at 22–23). But, as noted by LINA (doc. 31 at 18), these opinions are based on evaluations that took place before Dr. Estwanik's evaluation of Mr. Evans (doc. 23-2 at 120–121; doc. 23-9 at 229–230; *see* doc. 31 at 18); *cf. Glazer*, 524 F.3d at 1247 (giving more weight to a doctor who evaluated the plaintiff more recently). The only evaluations that post-date Dr. Estwanik's assessment upon which Mr. Evans relies are the findings from Mr. Lawrimore in 2020 and from Dr. Mensah in 2021. (Doc. 28 at 23, 31). As previously explained, the court does not find Dr. Mensah's opinion to be supported by the evidence in the record. And Mr. Lawrimore's opinion that Mr. Evans had "deficits" in ambulation, balance, endurance, function, range of motion, strength, and transfers would not prevent Mr. Evans from conducting sedentary work as explained by Dr. Dominitz. (Doc. 23-8 at 271; *see* doc. 23-9 at 52–53) (considering Mr. Lawrimore's reports when deciding Mr. Evans was able to do sedentary work). Further, the opinions cited by Mr. Evans conflict with other objective medical evidence—namely the benign findings from Dr. Mensah and the evaluations of Drs. Estwanik, Dominitz and Carabello. (*See* doc. 23-14 at 89–95; doc. 23-9 at 53; doc. 30-1 at 3–6; doc. 23-8 at 219). Thus, the more recent medical opinions all establish that Mr. Evans can perform sedentary work.

Mr. Evans argues that his favorable social security decision is evidence he is entitled to long-term disability benefits under the Plan. (Doc. 28 at 22). When the Social Security Administration has determined that a claimant is disabled, the award

should be considered, but is not dispositive, when deciding if a claimant is entitled to long-term disability benefits under ERISA. *See Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663, 666 (11th Cir. 2014); *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 n.5 (11th Cir. 1997). In its denial of long-term disability benefits, LINA acknowledged that the Social Security Administration found that Mr. Evans was disabled but determined, after reviewing the evidence before the Social Security Administration, that its decision was different because LINA considered more recent medical records that conflicted with those in Mr. Evans's social security file. (Doc. 23-8 at 202; doc. 23-13 at 29). The court finds this explanation persuasive. Mr. Evans does not make any argument as to why the court should find his favorable social security decision more persuasive than the newer medical records that indicate he can undertake sedentary work. (*See* doc. 28 at 22). Thus, the court finds that Mr. Evans's entitlement to disability payments from the Social Security Administration does not show that LINA's decision was wrong.

Further, the pain diary and declarations of pain written by Mr. Evans and his family are not persuasive pieces of evidence. (*See id.* at 28–29; doc. 23-8 at 239–250; doc. 23-11 at 196–213). Both the pain diary and the declarations of pain discuss how Mr. Evans's pain affects his daily life and the lives of his family. (Doc. 23-8 at 239–250; doc. 23-11 at 196–213). But these accounts only document how Mr. Evans claims he feels, they do not incorporate any objective medical evidence. Because

19

multiple doctors have indicated that Mr. Evans's reports of pain are likely exaggerated (*see* doc. 23-4 at 158; doc. 23-10 at 58; *see also* doc. 23-5 at 41) ("[Mr. Evans] uses a cane for balance and stability. He appears to carry it in the wrong hand."), and Mr. Evans's own accounts of his pain are all that these declarations are based on, the court does not find this evidence persuasive.

Mr. Evans contends that LINA did not take into account how his pain medications "affected his cognition and ability to focus." (Doc. 28 at 32). The only portion of the record that Mr. Evans cites to support this statement are the declarations submitted by him and his family. (*See id.*; doc. 23-8 at 239–250). As previously explained, the court does not find this evidence persuasive. And the court's own review of the record revealed multiple notes from doctors who evaluated Mr. Evans or his medical records and found that he had no side effects from the medication that he takes. (Doc. 23-10 at 59; doc. 23-8 at 212, 217; *see* doc. 23-9 at 54). Thus, Mr. Evans has not carried his burden on this point of establishing that any of his pain medications would prevent him from meaningful work. *See Horton*, 141 F.3d at 1040.

Mr. Evans asserts that his non-exertional limitations would also prevent him from working. (Doc. 28 at 31–32). Specifically, Mr. Evans cites to the May 2020 session with Mr. Lawrimore and his favorable Social Security Disability award as evidence of his (1) inability to stay on task for at least 85% of the day; (2) need for

frequent position changes; (3) need for frequent unscheduled breaks throughout the workday; and (4) that excessive absences would prevent him from maintaining a full-time position. (*Id.*). The court has already explained why it will not credit Mr. Evans's favorable Social Security Disability award over the opinions of Dr. Estwanik, Dr. Dominitz, and Dr. Carabello and that Mr. Lawrimore's opinion does not conflict with the determination that Mr. Evans can do sedentary work. Thus, the court finds that Mr. Evans's has not submitted evidence sufficient to establish that his non-exertional limits would preclude him from work.

Finally, Mr. Evans asserts that his vocational analyst erred in finding that he could work as a routing clerk or a gate guard because his "chronic back pain[,] inability to sit and stand with any frequency[,] . . . difficulty ambulating[,] . . . [and] that he is a fall risk" would prevent him from working in these occupations. (Doc. 28 at 33). But as previously discussed, multiple doctors have found that Mr. Evans's pain is not as severe as he states, and every doctor's opinion that Mr. Evans cannot sit, stand, ambulate, and that he is a fall risk is based exclusively on Mr. Evans's own reports of pain, not objective medical evidence. (*See* doc. 30-1 at 13; doc. 23-2 at 120–121; doc. 23-15 at 52). Again, the court finds that Dr. Estwanik, Dr. Dominitz, and Dr. Carabello's findings that Mr. Evans could sit, stand, and walk persuasive. (Doc. 23-14 at 89–95; doc. 23-9 at 54; doc. 30-1 at 3–6). Thus, the court

finds no evidence in the record that establishes that Mr. Evans would be unable to do any of the jobs identified by his vocational analyst.

### III.    CONCLUSION

At the conclusion of its *de novo* review of the administrative record, the court finds that LINA's decision to deny long-term disability benefits under the Plan was not wrong.

Accordingly, the court **WILL GRANT** LINA's motion for judgment on the administrative record. (Doc. 26). The court **WILL DENY** Mr. Evans's motion for judgment on the administrative record. (Doc. 27).

**DONE** and **ORDERED** this June 7, 2023.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE